# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CANDACE HEATH,                                          Case No. 1:18-cv-26

        Plaintiff,                                   Black, J.
                                                        Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Candace Heath filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff argues that the ALJ's credibility determination is not substantially supported, and that therefore, the corresponding non-disability finding should be reversed. As explained below, I conclude that the ALJ's decision should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

### I. Summary of Administrative Record

In April 2014, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning on March 1, 2014 based on a combination of physical and mental impairments. After her disability claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an ALJ.

On December 21, 2016, Plaintiff appeared with counsel and gave testimony before ALJ Aubri Masterson; a vocational expert also testified. (Tr. 44-86). Plaintiff was 46 on

her alleged disability onset date and remained in the same "younger individual" age category as of the date of the ALJs' decision. She has a high school education and lives in a house with her boyfriend.

On February 14, 2017, the ALJ issued an adverse written decision, concluding that Plaintiff is not disabled. (Tr. 10-28). The ALJ determined that Plaintiff has severe impairments of: "bilateral carpal tunnel syndrome, status-post right tunnel release; pip joint contracture of right small finger from prior fracture; cervical spine degenerative disc disease; adhesive capsulitis of le[f]t shoulder, status-post April 2016 surgery; bipolar disorder; Posttraumatic stress disorder (PTSD); alcohol use disorder; major depressive disorder; and cluster b personality disorder. (Tr. 12). Plaintiff does not dispute the ALJ's determination that none of her impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 13).

The ALJ determined that Plaintiff cannot perform her past relevant work as a customer service representative or general laborer, but found that she retains the residual functional capacity ("RFC") to perform a restricted range of light work, subject to the following limitations:

> [S]he can frequently push or pull with the bilateral upper extremities; she can occasionally climb ramps and stairs; she can never crawl, kneel, crouch, or climb ladders, ropes, or scaffolds; she can never balance on slick surfaces, narrow surfaces, or uneven terrain; she can frequently handle, finger, and feel bilaterally; she cannot perform overhead reaching with her upper extremities; she is restricted to work that is performed indoors in a moderate noise environment…; she must avoid all hazards and exposure to vibrations; and she must avoid all exposure to fumes and odors. She is limited to simple, routine tasks. She cannot interact with the public. She is limited to brief and superficial interaction with coworkers; she can frequently interact with supervisors during the probationary period and then only occasionally. She cannot perform production pace or quota-driven work. Work is limited to a static work environment.

(Tr. 15). Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a "significant number" of jobs in the national economy, including the representative jobs of office helper, cafeteria attendant, and bakery worker. (Tr. 27). Therefore, the ALJ determined that Plaintiff was not under a disability. The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In her appeal to this Court, Plaintiff argues that the ALJ erred in making an adverse credibility determination, leading the ALJ to conclude that her mental limitations were not disabling.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports

3

the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Substantial Evidence Supports the ALJ's Decision**

**1. Law Applicable to Credibility Determination**

Plaintiff's sole claim is that the ALJ committed reversible error when she made an adverse credibility determination, finding that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 23). Plaintiff primarily focuses on her mental impairments, arguing that the adverse credibility determination "in turn, resulted in an RFC used at steps four and five that is also not supported by substantial evidence." (Doc. 9 at 18).

As Plaintiff acknowledges, a reversal of the Commissioner's decision based upon error in a credibility determination requires a particularly strong showing by Plaintiff. That is because "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Com'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir.2003) (citations omitted). Like the ultimate non-disability determination, the credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir.2004).

## 2. Plaintiff's Criticisms of ALJ's Credibility Finding

Plaintiff argues that the ALJ's credibility analysis "is replete with unsupported contentions, resulting in a determination that is not supported by evidence in the record, nor sufficiently clear as to the reasons for the ultimate credibility finding." (Doc. 9 at 19). Plaintiff accuses the ALJ of finding her not to be credible "primarily because (1) she was treated and represented by men, although she allegedly claimed to have a fear of men; (2) she received rather 'conservative' mental health treatment, and (3) her presentation at the psychological [consulting examination] was inconsistent with other evidence in this record." (*Id.*)

Having closely reviewed the ALJ's analysis, I find no reversible error. Contrary to Plaintiff's position that the ALJ was "not sufficiently clear" as to the reasons for her adverse finding, the ALJ provided extensive analysis throughout her opinion that detailed multiple contradictions between Plaintiff's subjective complaints and the record as a whole, including but not limited to Plaintiff's medical records. Further, the undersigned does not agree with Plaintiff's characterization of the "primary" basis for the adverse credibility determination. Although the three reasons articulated by Plaintiff in her Statement of Errors were referenced by the ALJ, a review of the decision as a whole confirms that they were not the sole basis for discounting her subjective complaints. Indeed, the contradictions between Plaintiff's testimony concerning her alleged *physical* limitations and various records provided at least as significant a basis for discounting her credibility as did contradictions that undermined her subjective psychological complaints. Viewing the record as a whole, and adhering to the deferential standard that applies to credibility determinations, the undersigned concludes that the ALJ's adverse determination is substantially supported.

### 3.  Facts Undermining Subjective Physical Complaints

Although counsel argued at the hearing that his client's claim was "primarily…a mental health case," (Tr. 49), Plaintiff testified to a combination of physical and mental impairments.  Plaintiff testified that a physical impairment caused her to leave the work force in 2014, but that her anxiety and panic attacks prevented her return.  (Tr. 54-55). Notably, discrepancies in the record concerning both physical *and* mental impairments led the ALJ to discount Plaintiff's subjective complaints about the severity of her symptoms, and ultimately to determine an RFC that – although quite restricted - was not work-preclusive.  The ALJ began her assessment by discussing Plaintiff's physical issues, stating that although the record "supports the inclusion of several long-term work restrictions, the claimant's allegations of total disability are inconsistent with the overall objective medical evidence."  (Tr. 15).

For example, the ALJ noted that in February 2014, Plaintiff's primary care provider diagnosed only a left shoulder strain and referred her to physical therapy.   A few months later, Plaintiff was diagnosed with severe right carpal tunnel syndrome ("CTS") and moderate CTS on the left, but with no evidence of neuropathy, cervical radiculopathy, brachial plexopathy or ulnar neuropathy.  (Tr. 16).  At a consultative exam in July 2014, Plaintiff informed Dr. Swedberg that numbness and pain in her hands were her main medical deterrent to working.  However, despite reported difficulty with some manipulative tasks such as opening jars or lifting heavy objects, she acknowledged she was still able to drive.  (Tr. 16).

An August 2014 imaging study of the cervical spine revealed moderately severe to severe degenerative changes which could be expected to result in some pain and dysfunction. (Tr. 17).  However, Dr. Swedberg's physical examination one month earlier

was generally unremarkable, including a lack of cardiopulmonary deficits and essentially normal musculoskeletal and neurologic examination including intact strength and range of motion at the extremities, no signs of pain or loss of motion at the neck or loss of motion throughout the spine, no muscle atrophy, loss of sensation, or any other significant deficits. (Tr. 16-17). In November 2014, Plaintiff complained to an orthopedist, Dr. Smail, of gradually worsening and radiating neck pain, along with bilateral arm weakness and numbness and rather substantial deficits in daily activities due to pain and related dysfunction. (Tr. 18). However, Dr. Smail also recorded "generally unremarkable" physical findings including normal strength at the upper extremities and shoulders, essentially intact reflexes and sensation, aside from some loss at the hands consistent with CTS. Dr. Smail found some tenderness along the spine but intact range of motion at the neck and recommended only conservative care.

The ALJ also noted other contradictions between Plaintiff's subjective complaints about her CTS and objective records that supported a less-than disabling level of hand limitations. For example, Dr. Swedberg noted positive Tinel and Phelen signs, but well-reserved grip strength and manipulative ability in both hands along with intact range of motion at both hands and wrists. (Tr. 16). Plaintiff's orthopedic surgeon, Dr. Abbott, similarly assessed CTS and PIP joint contracture of the right small finger from a prior fracture, but after a September 2014 right surgical release with no complications, Dr. Abbott noted improving right hand grip and right wrist stiffness along with resolving tingling at the right hand. (Tr. 17). Post-surgery physical findings were also "relatively unremarkable" other than a finding of trigger finger of the right thumb (for which a steroid injection was given) and continued left wrist CTS, for which an additional surgery was recommended. (Tr. 17).

Plaintiff complained that she had not regained "full range of motion" in her right hand in November 2014, but that was somewhat contrary to Dr. Abbott's examination findings. (Tr. 17). Taken together, those findings and Plaintiff's inquiries about proceeding with left hand surgery suggested that the surgery on the right hand and wrist "was rather successful and provided significant relief." (Tr. 17). Later, when Plaintiff continued to report pain in her right wrist and hand, Dr. Abbott observed only some pain at extreme limits of motion along with sensitivity at the surgical site but made no treatment recommendations other than continued massage to break up adhesions and reduce scar sensitivity. (Tr. 18). Similarly, in November 2014, Dr. Smail noted no signs of impingement at the shoulders or post-surgical positive signs of CTS on the right, but only on the left, for which (at the time) Plaintiff had scheduled a second surgery.[1] (Tr. 18). Dr. Smail ordered an MRI of the cervical spine, which showed mild to moderate pathology including stenosis, mild cord flattening and disc protrusions. However, his findings and recommended conservative treatment remained unchanged. (Tr. 19). At subsequent visits to Dr. Smail, Plaintiff continued to complain of severe neck pain and related dysfunction, but those complaints frequently were contrasted with "generally unremarkable physical findings." (*Id.*) A May 2015 MRI showed multilevel degenerative changes, but no spinal cord compression or cervical radiculopathy. (*Id.*)

Shortly after her date late insured, in April 2016, Plaintiff was seen by another orthopedist, Dr. Checroun, for left shoulder pain and related dysfunction that hadn't responded well to physical therapy or pharmacological treatment. The ALJ pointed out that Plaintiff reported "that her left shoulder pain started secondary to lifting a lot of wood,

_____

[1]It appears Plaintiff later decided not to proceed with the left CTS surgery. (*See* Tr. 18)

which certainly suggests that prior carpal tunnel and cervical spine treatment had been rather effective." (Tr. 19). Dr. Checroun found no neurologic abnormalities and noted a recent CT scan failed to show any signs of rotator cuff tear or significant arthritis. At the time, an EMG showed only "borderline" evidence of mild left CTS and "borderline" evidence of possible left ulnar neuropathy. Dr. Checroun assessed adhesive capsulitis and recommended manipulation under anesthesia, but no other treatment. He later performed the recommended arthroscopic capsular release with no complications, and within two weeks, Plaintiff was reporting decreased left shoulder pain and physical findings were benign. (Tr. 19). In June 2016, Plaintiff again reported decreased pain, but complained of limited range of motion at her shoulder. Dr. Checroun administered a steroid injection to her shoulder and urged Plaintiff to continue home exercises. He did not recommend any additional treatment and noted that Plaintiff continued to make functional gains. At a primary care visit the same month, Plaintiff reported "significant improvement" in her left shoulder. (Tr. 19).

The ALJ pointed out that other primary care treatment records were "relatively routine in nature" with various problems "largely addressed by medical and mental health specialists with primary care consisting of pharmacological management and treatment for acute issues," and "largely unremarkable" physical findings with "few if any observed overt signs of mental illness or significant physical distress." (Tr. 16). After remarking that inconsistencies in the record failed to support a disabling level of physical limitations, the ALJ concluded:

> The objective medical evidence does not support the allegations regarding the severity of her subjective [physical] complaints. For example, the evidence fails to document that the claimant has demonstrated signs typically associated with chronic, severe pain such as muscle atrophy, severe spasm, rigidity, or tremor. Moreover, despite claims of arthritis in multiple joints and severe bilateral hand wrist pain dysfunction, physical

findings have been relatively benign and unremarkable, including relatively little evidence of substantial abnormalities at the extremities. Additionally, medical personnel have consistently observed a normal gait with no balance or stability issues. In addition, imaging of the spine and shoulder, while demonstrative of pathology capable of producing pain and some dysfunction, has not demonstrated abnormalities that correlate with the extent of dysfunction alleged by the claimant.

Further, the claimant's allegations of disability are inconsistent with her medical regimen. Since her alleged onset date, she has not required any inpatient treatment or emergency treatment for acute difficulties. In fact, the majority of documented treatment, especially since the alleged onset date, has been conservative in nature and consisted largely of pharmacological management with reported improvement. While she has undergone several surgeries, follow-up records have referred to relatively good improvement with no significant post-surgical complications. Ultimately, the undersigned findings that limiting the claimant to light work with several additional postural, manipulative, and environmental restrictions adequately accommodates the claimant's objectively verified conditions.

(Tr. 24). In short, the ALJ determined that Plaintiff has multiple physical limitations, but that (contrary to Plaintiff's subjective complaints) those limitations did not persist at a disabling level during the period under review. The ALJ repeatedly pointed out examples of relatively "severe" subjective complaints that contrasted with "generally unremarkable physical findings" and "relatively conservative" treatment that was "inconsistent with total work preclusion." (Tr. 19). In this judicial appeal, Plaintiff does not challenge the ALJ's adverse credibility determination concerning her physical impairments, which the undersigned concludes is substantially supported by the record as a whole.

### 4. Plaintiff's Mental Health Records and Critique of the ALJ's Summary

Naturally, the ALJ's adverse credibility determination impacted the ALJ's view of Plaintiff's testimony, including the degree of her mental limitations. As with Plaintiff's physical limitations, the ALJ discounted Plaintiff's subjective report that her mental impairments were disabling, rather than resulting in limitations that merely restricted her

capacity for work. Citing "rather benign clinical and underwhelming mental health treatment," the ALJ assessed no more than "moderate" limitations overall. (Tr. 14).

> The degree and frequency of symptoms alleged by the claimant has varied but she has in general described reduced stress tolerance, fluctuating moods, emotional lability, reduced concentration/focus, and significant difficulty around others. While certainly warranting substantial work restrictions, the undersigned notes that these issues have been adequately addressed by the residual functional capacity at Finding #5.

> Among other things, the undersigned notes that the claimant's mental health treatment has been relatively conservative in nature and demonstrative of the ability to perform simple tasks in a reduced stress environment with very limited social interaction. F[o]r example, treatment records from several sources, while referring to a wide variety of psychological disorders, described relatively benign findings, especially when not exposed to significant stressors and compl[iant] with treatment recommendations. Additionally, while the claimant at times has described rather significant symptomatology to various sources, such complaints must be viewed with at least some caution given the marked contrast in presentation demonstrated by the claimant during Administration-provided evaluations, which suggest at least some degree of exaggeration of symptoms and inconsistency. The undersigned finds that limiting the claimant to the above-describe[d] range of simple, routine tasks in a reduced stress environment with very limited social interaction sufficiently accommodates [her] mental issues including her anxiety-related problems.

(Tr. 24).

Before turning to Plaintiff's most specific criticisms, the undersigned briefly summarizes Plaintiff's mental health records. Those records include therapy and medication treatment with Primary Health Solutions between March 2013 and May 2014, and at Butler Behavioral Health between June of 2014 and December of 2016.[2] In her Statement of Errors, Plaintiff concedes that her treatment notes appear to show improvement at multiple times throughout the records. (*See, e.g.*, Doc. 9 at 11-12, citing numerous records that noted "good progress" and similar positive statements). However,

---

[2]As Defendant points out, because Plaintiff's date last insured for DIB was March 31, 2016, records after that date have relatively little relevance to the determination of whether Plaintiff is entitled to DIB.

she argues that the ALJ's failure to credit her most severe complaints inappropriately ignores the "ebb and flow" of her symptoms, particularly when she was not compliant with her medications.[3]  However, while it is not uncommon for mental illness to "ebb and flow," it is not this Court's role to reweigh evidence that is subject to more than one interpretation.  Contrary to her argument, the records referenced by Plaintiff provide support for the ALJ's conclusion that Plaintiff's symptoms on the whole were not disabling but instead often demonstrated "reported improvement." (Tr. 24).

No treating or examining physician or psychologist opined that Plaintiff was disabled or provided much in the way of specific functional limitations.  To the contrary, Plaintiff's treating psychiatrist, Dr. Gillig, opined on October 1, 2015 that Plaintiff could not work in a group setting but may be able to work alone.  (*See* Tr. 781, opining that Plaintiff "may be able to work alone" such as a job "filing documents, etc.", but would not be able to work around groups of people).  And Dr. Gillig opined that Plaintiff's difficulty was expected to last for the next 6 months, not for 12 months or longer.  Although the ALJ gave the opinion "little weight" because it was not well-supported, it is worth noting that Dr. Gillig's opinion is consistent with the ALJ's determination that Plaintiff would be able to perform the job of "office helper." (*See* Tr. 26, noting that Dr. Gillig's opinion was consistent to the restriction of no public contact and very limited interaction with coworkers or supervisors).

The main piece of evidence on which Plaintiff relies to support her challenge to the ALJ's credibility determination is a July 9, 2014 psychological consulting examination

---

[3]Plaintiff maintains that to the extent the ALJ may have discounted her subjective complaints based upon that medication non-compliance, the ALJ erred because Plaintiff provided an "understandable and reasonable explanation" by testifying that she did not like the side effects.  This argument is a red herring because the ALJ did not reference Plaintiff's medication non-compliance.

report by Jessica Twehues, Psy.D.  At her examination, Plaintiff presented with myriad mental and physical symptoms.  Although Dr. Twehues did not offer <u>specific</u> functional limitations, she did opine generally that Plaintiff "is expected to be able to understand instructions for both simple and complex tasks," but "would likely have difficulty with retention of information due to severe mood disturbances and anxiety," and "is likely to be prone to making careless mistakes." (Tr. 396).  Dr. Twehues further opined that Plaintiff tracked conversation "fairly well" but "is likely to have difficulty sustaining focus for prolonged periods of time," with "particular difficulty with focus during manic episodes and in large groups due to symptoms of PTSD."  (Tr. 397).  Additionally, "[d]uring depressive episodes, her work pace is likely to be slowed and she may be prone to high absenteeism due to poor motivation." (*Id.*)  Dr. Twehues noted that Plaintiff "reported having a fearfulness of men and is likely to be hypersensitive to criticism from others, especially male supervisors." (Tr. 397).  Though not necessarily related to work, Dr. Twehues noted that in "large social settings," Plaintiff is "likely to feel overwhelmed" and "may be prone to experiencing panic attacks." (*Id.*)  Dr. Twehues further opined that she "is likely to have difficulties coping with major changes in her work routine, as well as everyday minor workplace pressures," and that increased stress and pressure "would likely increase her mood disturbances and anxiety and make it more difficult for her to focus and persist on work related tasks."  (*Id.*)  The ALJ gave Dr. Twehues's opinions "little weight" to the extent that her opinions could be viewed as raising "significant concerns regarding the claimant's retained ability to perform competitive work" due to "significant difficulty around men, diminished stress tolerance, fluctuating moods, diminished concentration and severe anxiety-related issues."  (Tr. 26).

Two non-examining consultants, Drs. Hoyle and Warran, reviewed the mental health records including Dr. Twehues's report, which they gave "great weight." However, Dr. Hoyle opined that the evidence showed only moderate work-related difficulties in maintaining social functioning and in maintaining concentration, persistence and pace, with only mild restriction in activities of daily living. At the reconsideration level, Dr. Warran expressed identical opinions. (Tr. 111-113, 125-126, 140-141). The ALJ gave Dr. Warran's opinions "partial weight" but added additional mental limitations not specifically included by Drs. Hoyle and Warran in order to "better address the claimant's reduced stress tolerance and social anxiety." (Tr. 25).

### a. The ALJ's Description of Plaintiff's Treatment as "Conservative"

Plaintiff first ascribes error to the ALJ's use of the phrase "conservative mental health treatment." The ALJ used the phrase several times when describing Plaintiff's course of treatment for both physical and mental ailments. With respect to her mental health, the ALJ wrote:

> [Plaintiff's] treatment was routine and conservative in nature including generally benign clinical findings inconsistent with total work preclusion. In early March 2013, Mr. Hyatt, a social worker…, noted complaints of increased difficulty controlling anger or getting along with others…. Mr. Hyatt recommended possible medication adjustment and additional outpatient therapy…. Records at that time noted several mental diagnoses including PTSD, major depression, and cluster B personality disorder, but with a GAF score of just 55, which suggest[s] moderate level symptoms and is not typically associated with disabling limitations….
>
> Several weeks later, during a primary care visit, the claimant reported a variety of symptoms including poor sleep, fatigue, loss of appetite, depressed mood, social isolation, and several PTSD-related problems stemming from past traumatic events…. The examining nurse practitioner, Nurse Roller, noted a depressed affect, but described a generally unremarkable presentation including appropriate behavior, normal language, no signs of memory loss, no signs of psychosis, and normal attention/concentration…. In addition to referring to the mental disorders listed at Exhibit 1F/4, Nurse Roller also indicated bipolar I disorder; however, he did not recommend any drastic change to conservative care.

(Tr. 19-20).

Plaintiff cites *Boulis-Gasche v. Com'r of Soc. Sec.*, 451 Fed. Appx. 488 (6th Cir. 2011) for the proposition that a failure to seek mental health treatment is not a basis to discount otherwise credible complaints of mental illness. *See id.*, at 493 ("We have held that a claimant's failure to seek formal mental health treatment is 'hardly probative' of whether the claimant suffers from a mental impairment," internal citation omitted). In *Boulis-Gasche*, the Sixth Circuit chided an ALJ for improperly concluding that the plaintiff's panic disorder was "not a medically determinable impairment" based upon the lack of "formal mental health treatment" for that disorder. In that case, the ALJ's "conclusory statement" that Plaintiff did not seek *any* treatment was "contrary to the medical documentation in the record" which included both a reference to panic attacks and frequent doctor visits with complaints of anxiety. *Id. Boulis-Gasche* is clearly distinguishable. Here, the ALJ did not dismiss Plaintiff's mental impairments as "non-severe" but instead found multiple severe mental health impairments. Also unlike *Boulis-Gasche*, the ALJ thoroughly discussed Plaintiff's mental health treatment (which she regularly sought) and did not discredit her diagnoses based solely upon an alleged "failure" to seek "formal" treatment.

Still, Plaintiff challenges any adverse inference drawn from the characterization of her consistent treatment with a therapist, combined with psychiatric medications, as "conservative." She rhetorically asks: "Other than seeing a counselor/therapist and receiving prescriptions…, what form of treatment would constitute 'non-conservative' treatment in the eyes of the ALJ? Was Plaintiff supposed to undergo a lobotomy or unwarranted hospitalizations…?" (Doc. 9 at 21). In context, the undersigned concludes that the ALJ's use of the phrase "conservative mental health treatment" reflects the

absence of any need for emergency room visits, psychiatric hospitalizations, or similar more intensive programming or treatment. Importantly, any remaining ambiguity in this case is resolved by review of the ALJ's decision as a whole, which contains extensive analysis and numerous reasons for the adverse credibility determination.

### b. The ALJ's Summary of Dr. Twehues's Opinions

Plaintiff's second and third critiques of the ALJ's adverse credibility determination both relate to the ALJ's characterization – or what Plaintiff believes to be a mischaracterization – of the consulting examining psychologist's opinion. Plaintiff complains that the ALJ unduly emphasized statements in Dr. Twehues's report that reflected Plaintiff's "fearfulness of men" and "hypersensitive[ity] to criticism from others, especially male supervisors," (Tr. 397), and compounded that error by failing to fully accept Dr. Twehues's opinions. Although the undersigned agrees that the ALJ's description of Dr. Twehues's opinion was imperfect, the undersigned finds no reversible error because any perceived error was harmless.

While Plaintiff focuses on the ways in which the ALJ cited to Dr. Twehues's report to discount Plaintiff's credibility, she also implicitly challenges the ALJ's decision to give "little weight" to the opinions stated in Dr. Twehues's report. (Tr. 26). Unlike a treating physician, because Dr. Twehues was only a one-time examining psychologist, her opinions were not entitled to controlling weight. The ALJ reasoned that the "overall record fail[s] to document a level of dysfunction anywhere reasonably close to the level…described by Dr. Twehues." (Tr. 26). Ironically, on the whole, the undersigned concludes that Dr. Twehues's vague opinions concerning functional limitations were consistent with the more specific mental RFC actually determined by the ALJ in this case, with the exception of Dr. Twehues's reference to the possibility of excessive

17

absenteeism.[4]  Nevertheless, citing "inconsistencies between Dr. Twehues'[s] evaluation/findings and the remainder of the evidence of record," the ALJ stated that she "view[ed] Dr. Twehues' recommend[ations] with a grain of salt and gives them reduced weight." (Tr. 14).  Insofar as the ALJ discredited some of Dr. Twehues's opinions, the undersigned finds no error.

At her psychological examination with Dr. Twehues, Plaintiff arrived wearing a neck brace and exhibited "nonverbal pain behavior when standing out of her seat." (Tr. 395).  Dr. Twehues noted that "[a]t one point, she screamed out in pain and reported experiencing a neck spasm."  She reported multiple physical problems to Dr. Twehues,[5] who observed: "Her gait seemed somewhat slow" and her posture "appeared quite tense." (Tr. 395).  Plaintiff also reported fairly severe psychological symptoms, including "fearfulness around men."  (*Id.*)  She indicated she was unable to work

> due to a variety of mental issues including the effects of past traumatic events, self-isolation, a fear of crowds and groups, thoughts of self-harm, depressed mood, fluctuating mood, difficulty sleeping, excessive worry, emotional liability, poor energy, periods of mania, agitation, feelings of hopelessness and helplessness, difficulty trusting men, nervousness, panic attacks, problems focusing, diminished stress tolerance, and forgetfulness.…

(Tr. 20).  She also reported a history of mental health treatment and that her current outpatient therapy and prescribed medication were beneficial.

In discounting Plaintiff's credibility, the ALJ noted a "stark contrast" between Plaintiff's presentation to Dr. Twehues and her presentation at her consulting physical examination with Dr. Swedberg one week later.  The ALJ contrasted Dr. Twehues's

---

[4]Dr. Twehues's opinion concerning absenteeism was also somewhat vague, as she opined only that Plaintiff "may" be prone to high absenteeism only during depressive episodes.
[5]For example, she reported bilateral CTS, skin cancer surgery, two rotator cuff surgeries, a uterine ablation, removal of her cervix, rheumatoid arthritis and tendinitis. (Tr. 393).

findings with Plaintiff's "general presentation during the evaluation" and "the overall medical evidence of record, which strongly suggests that Dr. Twehues' findings are not an accurate representation of the claimant's long-term mental or physical state." (Tr. 20-21).

> For example, Dr. Twehues noted that the claimant appeared "significantly depressed" with rather dramatic behavior during the evaluation including screaming out in pain, wearing a neck brace, moving very slowly, emotional lability throughout much of the evaluation, and appearing agitated and tense during the evaluation…. As discussed in detail above, Dr. Swedberg did not describe behavior in any way approaching the claimant's presentation during this evaluation, despite it occurring just one week later, including absolutely no signs, deficits, or even reported pain at the neck, no overt signs of general pain, no observed difficulties ambulating, no use or indication of recent use of a neck brace, or any indication of emotional lability…. It should further be noted that Dr. Swedberg is a male, which according to the claimant's claims made to Dr. Twehues, would have reasonably resulted in at least some degree of overt signs of anxiety, discomfort, or distress. The lack of such dysfunction certainly is inconsistent with the claimant's complaints and Dr. Twehues' observations/concerns.

(Tr. 21).

In addition, Dr. Swedberg's exam included some observations about Plaintiff's mental state. Dr. Swedberg observed "no signs of mental anxiety [or] other forms of mental distress, no signs of memory loss, and no apparent discomfort or unease with being examined by a male doctor." (Tr. 16). Similarly, at a February 2014 appointment with a primary care physician, Dr. Malloy "did not describe [any] overt signs of mental illness including no reported emotional lability or signs of agitation anxiety." (Tr. 16). While acknowledging that Plaintiff has consistently sought mental health treatment, the ALJ noted "few if any observed overt signs of mental illness or significant physical distress consistent with the claimant's presentation during the July 2014 … psychological evaluation." (Tr. 16, citing an August 2014 report by a nurse practitioner of normal memory, appropriate mood and affect, normal judgment and no indication of fear or

apprehension).  The ALJ further cited the records of two orthopedists who observed no mental or physical distress consistent with Plaintiff's presentation to Dr. Twehues.  (*See, e.g.*, Tr. 18, noting that "Dr. Abbott also did not observe any overt signs of mental distress during this visit and the claimant's overall presentation was striking[ly] inconsistent with her presentation during" the psychological evaluation; *see also id.*, "Despite the claimant's myriad of complaints, Dr. Smail's physical findings were generally unremarkable…. [S]he observed no signs of distress or over[t] indication of mental illness, which again is in marked contrast to the claimant's rather dramatic presentation" during her agency evaluation a few months earlier).  Even observations from other mental health providers failed to correlate with the more "dramatic" presentation of symptoms reflected in Dr. Twehues's report.   For example, a treating psychiatrist noted increased symptoms in June 2013 but that Plaintiff had "an intact memory, good intelligence, good reasoning, intact attention, and no psychomotor behavior deficits." (Tr. 20).  Plaintiff reported "improved symptomatology" within a month of that psychiatrist's medication adjustment. And as previously mentioned, a treating psychiatrist suggested in October 2015 that Plaintiff remained capable of working so long as she did not work in a group setting.

The ALJ pointed out other apparent contradictions, such as the fact that Plaintiff reports spending most of her days alone but acknowledged that she has a valid driver's license and is able to drive, is able to perform most household chores, and enjoys hobbies including reading and writing.  She reported to Dr. Twehues that she takes walks, washes dishes, cooks, vacuums, and dusts, has a few close friends, and feels close with her boyfriend and cousins.  (Tr. 394; *see also* Tr. 20, noting close relationships and that she has no difficulty with personal hygiene).  I find no error in the ALJ's assessment of Plaintiff's credibility, or in the "little weight" given to Dr. Twehues's opinions to the extent

that Plaintiff believes her report bolstered Plaintiff's subjective testimony that her mental limitations were disabling.

I also find no reversible error in the ALJ's *partial* mischaracterization of the portion of Dr. Twehues's report that described Plaintiff's "difficulty trusting men," that she is "easily startled and often on guard," (Tr. 394), that Plaintiff "reported fearfulness around men," (Tr. 395), and that Plaintiff exhibits hypersensitivity to "criticism from others, especially male supervisors." (Tr. 397). In making the adverse credibility finding, the ALJ stated that "much of the treatment records available for review come from male providers who in no way observe the severe reaction to men that the claimant told Dr. Twehues that she suffers." (Tr. 26). The undersigned agrees that the ALJ's reference to Plaintiff telling Dr. Twehues that she suffers from a "*severe reaction to men*" is a mischaracterization of the statements contained in Dr. Twehues's report, even though at least one treatment record evidences such a reaction.[6] However, I find no similar mischaracterization in the ALJ's observation that Plaintiff's "presentation during the hearing was essentially unremarkable with no overt indication of distress stemming from her representative being a man or being placed in a reasonably stressful situation." (Tr. 14). *Accord, Walters*, 127 F.3d at 531. Most importantly, considering the record as a whole including the many inconsistencies between Plaintiff's subjective testimony and the record concerning the extent of both her physical and mental limitations, I conclude that any error in the partial mischaracterization of Dr. Twehues's report was harmless. The alleged error is not sufficient to undermine

---

[6]Plaintiff contrasts the statement in Dr. Twehues's report with a treatment note from August 2014 from her psychiatrist, in which Plaintiff related an event in which a man approached her to offer tomatoes for sale, and Plaintiff became so frightened that she ran to her car and cried for 20 minutes. (Doc. 9 at 24, citing PageID 739). Plaintiff asserts that her general fear of men results in a "severe" reaction only in contexts like the one reported in the treatment note, where the man is a stranger, and does not manifest with "regularly treating" male providers.

the substantial evidence that otherwise supported the ALJ's credibility determination and ultimately, to the non-disability finding in this case. The ALJ did not find that Plaintiff could not work around men, but instead found (consistent with Dr. Twehues's report) that she could work with both men and women, but that interactions should be limited. Specifically, the ALJ limited Plaintiff to no interaction with the public at all, and only brief and superficial interactions with coworkers with frequent interaction with supervisors only during her probationary period, and only occasional interactions after that. (Tr. 15). The referenced RFC finding, as well as the credibility analysis, both fall well within the zone of reasonable choice.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

 _/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CANDACE HEATH,                                              Case No. 1:18-cv-26

       Plaintiff,                                              Black, J.
                                                           Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).